# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

USAA CASUALTY INSURANCE
COMPANY, *as subrogee of
Elizabeth Dumas-Schneider*,

     Plaintiff,

     v.

DAMPP-CHASER ELECTRONICS CORP.,

     Defendant.

Civil Action No. TDC-20-3484

## MEMORANDUM OPINION

Plaintiff USAA Casualty Insurance Company ("USAA"), as subrogee for its policyholder, Elizabeth Dumas-Schneider, filed this civil action against Defendant Dampp-Chaser Electronics Corporation ("Dampp-Chaser") alleging negligence, strict liability, and a breach of an implied warranty arising from USAA's allegations that a device manufactured by Dampp-Chaser was defective and caused a fire that damaged Dumas-Schneider's home. Dampp-Chaser has filed a Motion for Summary Judgment, which is now fully briefed. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be DENIED.

## BACKGROUND

On Saturday, June 9, 2018, a fire started at the home of Elizabeth Dumas-Schneider and her husband, Karl Schneider, in Adelphi, Maryland. Dumas-Schneider and Schneider are music teachers who give private lessons at their home in a music studio. That afternoon, Dumas-Schneider and Schneider left their home at approximately 1:50 p.m. to attend a music recital for

their students at a local church. When Schneider returned at approximately 5:00 p.m., he discovered that there had been a fire that resulted in significant damage to the house and certain personal property.

Dumas-Schneider had a homeowner's insurance policy with USAA. Upon receipt of an insurance claim, USAA paid $589,085.30 to Dumas-Schneider to cover the damage caused by the fire. Upon paying the claim, USAA became a subrogee of Dumas-Schneider entitled to assert rights and claims relating to the fire damage.

After the fire, USAA retained two experts to investigate the fire: Dan Maxwell, a certified fire investigator, and David Rock, a forensic electrical engineer. Based on burn patterns, particularly those showing severe fire damage on the underside of the piano, Maxwell concluded that the fire originated under the piano in the music studio. The only potential fire source under the piano was a humidity control device designed and manufactured by Dampp-Chaser.

A few months before the fire, sometime between late 2017 and early 2018, Dumas-Schneider had purchased the humidity control device known as a humidistat ("the Humidistat") for her piano for the purpose of keeping the piano in tune for longer periods of time. Dumas-Schneider had the device professionally installed while she was present in the home. Prior to the fire, the Humidistat had functioned normally, it was never unplugged for any reason, and the power cord was not damaged or otherwise impinged upon in any way.

Upon review of the remains of the Humidistat and the other electrical devices, cords, and outlets in the music studio, Rock concluded that "the fire was not the result of a failure of [a relocatable power tap], the candle luminaires, the floor lamp, or a receptacle" and that "the only item in the area of origin that cannot be ruled out as a potential cause of the fire is the [Humidistat]. However, due to the level of damage to the system and components, a definitive point of failure

2

cannot be determined." Rock Report at 10, Opp'n Ex. D, ECF No. 34-4. Dampp-Chaser, for its part, retained its own expert, Robert Magnotta, a forensic electrical engineer, who concluded that the Humidistat was not the cause of the fire because the plastic box around the Humidistat control panel did not support combustion, he did not detect evidence of electrical activity in the electrical cord providing power to the Humidistat control panel, and the relevant fuse was not blown.

On October 19, 2020, USAA, as the subrogee of Dumas-Schneider, filed this civil action against Dampp-Chaser in the Circuit Court for Prince George's County, Maryland seeking $589,085.39. Dampp-Chaser removed the case to this Court. In the Complaint, USAA has alleged that the fire was caused by a defect in the Humidistat and has asserted the following claims against Dampp-Chaser in the following numbered counts: (1) negligence; (2) strict product liability; and (3) breach of the implied warranty of merchantability.

## DISCUSSION

In its Motion for Summary Judgment, Dampp-Chaser argues that USAA has presented insufficient evidence to support a finding that a defect in the Humidistat was the cause of the fire and that, as a result, it is entitled to summary judgment. USAA argues that there is, at a minimum, a genuine issue of material fact on whether the Humidistat caused the fire.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in

the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

## II.  Product Defect

Dampp-Chaser's Motion rests on the claim that the evidence is insufficient to support a finding that the Humidistat had a product defect that caused the fire. Under Maryland law, a plaintiff in a products liability action must establish three evidentiary "basics," regardless of the theory of recovery:  (1) "the existence of a defect"; (2) "the attribution of the defect to the seller"; and (3) "a causal relation between the defect and the injury." *Virgil v. "Kash N' Karry" Serv. Corp.*, 484 A.2d 652, 656 (Md. Ct. Spec. App. 1984); *Jensen v. Am. Motors Corp.*, 437 A.2d 242, 247 (Md. Ct. Spec. App. 1981). On the issue of a product defect:

> A product defect may be shown by putting forth one or more of three different types of evidence:  (1) direct proof based on the nature of the accident in the context of the particular product involved; (2) circumstantial proof based on an inference of a defect from a weighing of several factors; and (3) direct affirmative proof through opinion testimony by an expert witness.

*Assurance Co. of Am. v. York Int'l, Inc.*, 305 F. App'x 916, 921 (4th Cir. 2009) (quoting *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp.2d 378, 407–08 (D. Md. 2001)). In arguing that the evidence is sufficient to establish a product defect, USAA relies on the second prong, "circumstantial proof based on an inference of a defect from a weighing of several factors." *Id.* "An inference of a defect may be drawn from the happening of an accident, where circumstantial evidence tends to eliminate other causes, such as product misuse or alteration." *Harrison v. Bill Cairns Pontiac, Inc.*, 549 A.2d 385, 390 (Md. Ct. Spec. App. 1988). However, "proof of a defect must arise above

4

surmise, conjecture, or speculation," and the "right to recovery may not rest on any presumption from the happening of an accident." *Id.* (quoting *Jensen*, 437 A.2d at 245). Maryland courts consider five factors in determining whether a product defect may be inferred from circumstantial evidence: (1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) a history of the same type of accident in similar products; (4) the elimination of other causes of the accident; and (5) the fact that the type of accident is one that does not happen without a defect. *Id.*

### A.    Expert Testimony

The first factor requires consideration of whether the plaintiff has produced expert testimony that the cause of the fire was a defect in the product at issue. USAA has presented expert testimony from two witnesses which collectively provides circumstantial evidence supporting its theory that the fire was caused by a defect in the Humidistat. Dan Maxwell, a certified fire investigator, provided an expert opinion on the origin of the fire. Based on an examination of the burn patterns and the fact that the most extensive fire damage was on the underside of the piano in the music room, Maxwell concluded that the "fire originated underneath the piano" and "grew in intensity until it fully involved the room of origin." Maxwell Report at 4, Opp'n. Ex. C, ECF No. 34-3. He has further asserted that "the only potential ignition source in the area of origin was the Dampp-Chaser Piano Life Saver System," and it "could not be ruled out as a potential cause of the fire." *Id.* By contrast, he concluded that "all other identified ignition sources in the room of origin were ruled out as a fire cause." *Id.* Thus, while Maxwell did not definitively conclude that the Humidistat caused the fire, he narrowed the point of origin to a specific location and ruled out all other ignition sources.

USAA's second expert, David Rock, an electrical engineer, examined the remains of the Humidistat, the electrical cords, outlets, circuit breakers, and other electrical equipment in the area and identified only two possible causes of the fire:   that the fire was caused by "a failure of the Piano Life Saver humidistat internal components" or by "resistive heating occurring at a plug-in connection at the Piano Life Saver humidistat control box."   Rock Report at 9.   Because the Humidistat's circuit board and other internal components were so badly damaged, he could not reach a conclusion as to "a definitive point of failure."   *Id.* at 10.   Nevertheless, Rock has stated that the Humidistat's circuit board or internal components could fail in a number of different ways that could have caused the fire, including "a manufacturing error in any of the components," an error at a "solder point," or "an outright component failure."   Rock Dep. at 98, Opp'n Ex. F, ECF No. 34-6.

Dampp-Chaser points to the findings of its own expert witness, Robert Magnotta, who asserted that the Humidistat can be ruled out as a potential ignition source because (1) there was no evidence of electrical activity in or along any of the components or conductors associated with the Humidistat at the time of the fire; and (2) based on a test on an exemplar, the plastic box enclosure around the circuit board does not burn.   Magnotta Report at 6, Mot. Summ. J. Ex. A, ECF No. 32-3.   In his deposition, however, Rock disputed the conclusion that there was no electrical activity going to and from the Humidistat because, in his view, the level of damage to the conductors, which melted away during the fire, left insufficient evidence to allow for such a conclusion.   Rock also testified that a test on the combustibility of the plastic enclosure for Humidistat's control panel did not establish that the Humidistat did not cause the fire because there were other fuel sources nearby, such as the wooden underside of the piano and other plastic components, that could have supplied sufficient fuel for the fire to get started and spread.   In light

6

of this testimony, the contrary opinions of Dampp-Chaser's expert, at most, create a genuine issue of material fact that is not properly resolved on a motion for summary judgment.

Thus, USAA has presented expert testimony that, while not entirely definitive, supports the inference that the fire was caused by a defect in the Humidistat.

### B.    Occurrence a Short Time After the Sale

On the second factor, whether the accident alleged to have been caused by a product defect occurred a short time after the sale of the product, *Harrison*, 549 A.2d at 391, Dumas-Schneider purchased the Humidistat and had it installed sometime between late 2017 and early 2018, a time period of approximately three to eight months before the fire. As Dampp-Chaser acknowledges, this time period is short enough to support an inference of a product defect. *See Virgil*, 484 A.2d at 657 (finding that when a thermos exploded two to three months after its sale, that time period did not prevent an inference that the product was defective when acquired); *Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 388 (D. Md. 1993) (finding that where the sale of an electric blanket occurred ten months before the incident, it was "well within province of the jury to determine what inference to draw"). Accordingly, this factor weighs in favor of USAA.

### C.    Same Accident in a Similar Product

As to the third factor, whether the same accident has occurred with a similar product, *Harrison*, 549 A.2d at 390, the parties agree that there was an incident, which occurred in Europe, in which a Dampp-Chaser Humidistat had evidence of melting on the case. Though Dampp-Chaser argues that that incident involved a different circuit board and wiring, USAA counters that the same company manufactured the circuit board for both products. Hollifield Dep. at 3-4, Opp'n Ex. G, ECF No. 34-7. Thus, there is some limited circumstantial evidence on this factor that supports causation.

7

###     D.     Elimination of Other Causes

As to the fourth factor, whether causes other than a product defect have been eliminated, as discussed above, the expert testimony of Maxwell and Rock provides a basis to eliminate all possible causes unrelated to the Humidistat. Notably, Dampp-Chaser's expert, though challenging the conclusion that the Humidistat caused the fire, did not identify another possible source. Although in its brief, Dampp-Chaser speculates that the fire may have been caused by Dumas-Schneider's cat knocking over an electric candle in a window area, Maxwell's testimony that the point of origin was under the piano squarely refutes that claim, and Rock's testimony specifically eliminated the electrical candles or their power cords as the source of the fire. Further, Schneider testified in his deposition that the window candles were not plugged in at the time of the fire.

Although Rock did not rule out the possibility that the fire arose from a failure to properly connect the Humidistat at one of the plug-in connections, USAA has argued that this possible cause is undermined by the testimony of Dumas-Schneider that the Humidistat was professionally installed, was never unplugged, and that there was no interference with power cords since the installation that could have damaged or impinged upon them. Viewing the evidence in the light most favorable to USAA, as is required at this stage, there is a basis to conclude that causes other than a product defect have been eliminated.

###     E.     Overall Determination

Viewing the evidence in the light most favorable to USAA, the Court finds that there is at least some evidence under four of the five factors to support a finding of a defect based on circumstantial evidence. *See Harrison*, 549 A.2d at 390. Under these circumstances, even without consideration of the fifth factor, there is a genuine issue of material fact on the issue of a product defect that precludes summary judgment at this time. *See Watson*, 816 F. Supp. at 389 (denying

summary judgment where three of the *Harrison* factors favored the plaintiffs because a rational jury could return a verdict in favor of the plaintiffs).

## CONCLUSION

For the foregoing reasons, Dampp-Chaser's Motion for Summary Judgment will be DENIED.  A separate Order shall issue.

Date:   August 1, 2023

THEODORE D. CHUANG
United States District Judge

9